Filed 3/2/21  P. v. Castro CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR CASTRO,<br><br>       Defendant and Appellant. | C089101<br><br>(Super. Ct. No. 17FE007268) |

Defendant, Hector Castro, stands convicted of rape, sodomy, corporal injury on a cohabitant, false imprisonment, and making criminal threats.  He appeals arguing that the convictions must be reversed because the prosecutor's closing argument repeatedly misstated the inference the jury could draw from defendant's alleged prior acts of domestic violence and sexual assault, thus violating his right to "due process, effective assistance of counsel, and a fundamentally fair jury trial."  We disagree with his contention, but remand the matter for the limited purpose of requiring the trial court to

1

select and impose a specific prison term for defendant's conviction for criminal threats and then to stay execution thereof pursuant to Penal Code section 654. (Statutory section references that follow are to the Penal Code unless otherwise stated.)

FACTS AND PROCEDURAL HISTORY

Because of the limited issues on appeal, we briefly recount the factual history of this matter with further facts to be provided as needed in the discussion section.

At trial, the People presented the testimony of the victim, S.D, who said that she began dating defendant in 2012, while she was a college student. Defendant introduced her to webcam "modeling" wherein defendant and the victim would engage in sexual activities, which would be broadcast to paying subscribers. He later convinced S.D. that she would be more profitable if she performed sexual activities on her own, which she did.

The couple's romantic relationship continued for a few more years, and they continued to live together thereafter. By 2017, they were no longer dating, but were living together with separate bedrooms in an apartment S.D. rented for them in Sacramento. S.D. financially supported defendant, who she thought was mentally unstable. For example, defendant claimed to suffer from penile cancer, although he had not seen a physician and had claimed he was Jesus and that the couple was living in a reality TV show. When S.D. disagreed with defendant, he accused her of being an actor.

The People also presented S.D.'s testimony regarding uncharged domestic violence and sexual offenses when the couple lived in Arizona and also in Sacramento. When they lived in Arizona in 2016, S.D. paid for their 4,000 square foot house and otherwise supported defendant (who was unemployed) with her webcam pornography business. He threatened to tell her family about that business and also threatened to hurt her family.

2

Each day, S.D. would take breaks from her webcamming to prepare meals for defendant, who sometimes would throw the food on the ground and demand another meal. Around mealtimes and at other times, defendant would demand S.D. orally copulate him. If she refused, they would fight. Defendant also sodomized S.D. against her will. Defendant threatened that if S.D. did not consent by a designated time, he would "do it anyway." One time, defendant stated, "todays [*sic*] the day, so get ready or not." S.D. resisted., but eventually gave in so as to avoid more physical fighting.

Also in Arizona, defendant threatened her with a gun, placing it in her mouth. He further physically abused her, causing injuries that S.D. documented in photos. These injuries included scratching and bruising from his strangling her, a bite mark on her shoulder, bruising on her arms from being punched, bruising on her legs from being kicked, bruising around her eye from being hit in the face, and a bump on her head from defendant punching her. S.D. worried she would die every time she fought with defendant.

When they returned to Sacramento in 2017, S.D. selected the apartment she did because she knew a lot of people and thought if she and defendant fought, someone might help her or call the police. S.D. continued cooking, cleaning, and supporting defendant financially with her webcamming even though they were no longer dating. While in Sacramento, defendant forced S.D. both to orally copulate him and engage in sexual intercourse daily. S.D. did not want to engage in these acts, but defendant told her she had no choice because she "belonged to him." In Sacramento, defendant became more physical when engaging in his physical abuse. He started hitting and kicking the same places so that S.D.'s injuries would not fully heal. S.D. would use make-up or special clothing to cover her injuries. She was only allowed to close her bedroom door when working and was forbidden from locking it. Defendant also threatened to kill S.D. and her family.

As to the charged conduct of April 2017, S.D. testified to playing a video game one evening online with a female and male friend. Defendant became angry after watching her delete a text from one of her friends. He took the phone and dragged her from her bed into the living room. S.D. told defendant she wanted to leave, and he responded by kicking, punching, slapping, and strangling her while telling her she was not allowed to leave. S.D. tried to fight back, but ended up curled up as this was the worst fight they had ever had. Defendant hit her with a closed fist four or five times and kicked her in the side and back. Defendant restrained S.D. by putting his foot on her face and then choked her, threatening to kill her. Defendant produced a loaded gun, which he held first against her head and then his own, threatening that he would kill them both. Eventually, defendant put the gun away and apologized.

Defendant insisted S.D. accompany him to his room where they smoked marijuana and fell asleep. When she woke up, S.D. returned to her room. Approximately 30 minutes later, defendant came to her room. He was naked, angry, and demanding that S.D. perform oral sex on him. S.D. did not want to comply and told him so. When he failed to respond, she acquiesced, performing the requested act. When she was done, defendant left the room and returned with a large kitchen knife. He pointed the knife at her vagina and threatened that he would stab her if she did not allow him to have anal sex with her. S.D. felt threatened and that she did not have a choice, so she allowed him to first penetrate her vagina for lubrication and then to penetrate her anus with his penis. Afterwards, S.D. told defendant she wanted to leave, but defendant blocked and then locked the door, telling her she could not leave and would be beaten if she did.

Defendant later apologized and returned her phone. S.D. gathered some sheets and clothing and told defendant she was going to do laundry. After loading the washing machine, she grabbed a bag with her wallet, phones, and keys and fled the apartment. She called 911 from the car and eventually met an officer who transported her for a sexual assault exam. That exam disclosed injuries consistent with a "history of

4

penetrating assault" and also consistent with forcible sexual assault after being physically assaulted. Numerous physical injuries were observed on her person consistent with the abuse reported.

Defendant testified in his own defense, admitting that he kicked, slapped, grabbed, and scratched S.D. on the day in question. He denied punching her with a closed fist or strangling her. Defendant also admitted prior physical abuse of S.D. when they lived in Arizona, but denied that he had ever placed a gun in her mouth While acknowledging that neighbors had complained about loud noises coming from their apartment in Sacramento, he denied that the couple had fought in Sacramento with the exception of April 19, 2017. He also admitted some of his beliefs such as that the earth was flat, that he was Jesus, that he was on a reality TV show, and that doctors and S.D. had conspired against him to prevent him from getting a biopsy for his penile cancer.

Defendant further denied engaging in anything but consensual sexual activity with S.D. Their relationship was consensual and involved a degree of agreed upon violence including slapping, choking, spanking, biting, and the use of bondage toys such as a whip. On the morning of April 19, they had engaged in consensual vaginal and anal intercourse, although defendant admitted that he told investigating officers that his "dick has not worked for four years." Defendant explained that he had been high on Xanax when he sent the victim threatening text messages after she fled.

In rebuttal, the People offered testimony that defendant's arresting officer did not see any signs that defendant was intoxicated, nor was he told defendant had been taking Xanax. Another officer testified that defendant had been housed separately at jail at his own request and was not required to be in the psychiatric unit. Finally, a third officer testified that S.D.'s webcamming website had terms and conditions related to extreme sadomasochism and bondage.

The People's August 31, 2017, information charged defendant with forcible rape (§ 261, subd. (a)(2); count one); forcible sodomy (§ 286, subd. (c)(2); count two);

5

corporal injury resulting in a traumatic condition upon a cohabitant (§ 273.5, subd. (a); count three); false imprisonment (§ 236; count four); and criminal threats (§ 422; count five). It was further alleged that defendant used a knife in connection with count five. (§ 12022, subd. (b)(1).) The matter was tried to a jury which found defendant guilty on all counts and found the special allegation that he had used a knife true.

Thereafter on March 1, 2019, defendant was sentenced to an aggregate prison term of 15 years and eight months. In arriving at that sentence, the court set the domestic violence count as the principle term and sentenced defendant to three years, plus eight months for the false imprisonment. The court stayed imposition of a sentence for the criminal threats conviction pursuant to section 654. The court then imposed consecutive sentences of six years for the rape conviction and six years for the sodomy conviction as authorized by section 667.5.

## DISCUSSION

## I

### *Prosecutorial Misconduct*

As noted, *ante*, defendant argues the prosecutor's closing argument repeatedly misstated the inference the jury could draw from defendant's prior acts of domestic violence and sexual assault thus violating his right to "due process, effective assistance of counsel, and a fundamentally fair jury trial." Because his counsel failed to object to the prosecutor's argument, defendant contends his counsel provided ineffective assistance of counsel.

Defendant's failure to object to the People's argument forfeits this claim on appeal (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*)); but we have discretion to decide an issue of constitutional importance. (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1061 [appellate court may exercise discretion to consider

constitutional issues raised for the first time on appeal].) Given his ineffective assistance of counsel claim, we will address the merits of his contention.

First, we need not address the merits of defendant's argument regarding effective assistance of counsel as to his domestic violence conviction. He could not have been prejudiced by his counsel's performance as to that count since he testified he kicked, slapped, pushed, and grabbed the victim, S.D., on the day in question causing bruising and had physically assaulted her in the past.

Addressing the merits of his remaining claim regarding his convictions for rape and sodomy, for the following reasons it is not reasonably likely the prosecutor's argument confused the jury regarding the permissible inferences from defendant's prior conduct and thereby caused that jury to misapply the reasonable doubt standard. Accordingly, this claim fails, too.

Before instructing the jury, the court allowed the parties to present their closing arguments.

In the People's initial argument, the prosecutor admonished the jury that a victim does not have to be perfect to be protected by the justice system. She argued that S.D. was a victim of both rape and sodomy because she allowed defendant to place his penis inside her vagina and anus only after he threatened her with a knife and had beaten her physically early that day. The physical evidence also supported S.D.'s version of events.

The district attorney then explained the use of prior instances of sexual violence, about which defendant complains on appeal, stating:

"Domestic violence and sexual assault cases, there is [a] history, there is a relationship component and that complicates things. And the law says if, in the past, there has been nonconsensual sexual activity, you get to hear about that. You get to hear about that so when you judge the credibility of the witnesses again, it's not in this one distinct moment in time, but it's you're hearing about their history. Okay.

"So the law says it's -- and it's very, very specific when it comes to domestic violence and sexual violence. We're still only talking about the sexual violent acts that are charged, Counts One and Two. But under the law if you believe [S.D.] about the prior incidents of nonconsensual sex where she submitted, performed oral copulation out of fear of physical violence or retribution, told her she had to get ready for anal sex because it was going to happen, and her submitting because she is afraid of a beating, if you believe her, not beyond a reasonable doubt which is the highest standard of the land, but actually by a preponderance of the evidence, you can find -- again, this is another piece of circumstantial evidence -- that the defendant was disposed or inclined to commit rape, that he was disposed or inclined to commit sodomy.

"You don't have to stop there. And that the defendant was likely to commit and did commit the crimes that are charged in this case, okay, the crime of specifically rape and sodomy. [¶] That's very powerful information and evidence, but it's for a specific purpose. Again, you are not looking at the snapshot in time, you are looking at the history. It also takes into consideration that it sometimes is just the victim's word, which, by the law, says if you believe beyond a reasonable doubt, it's sufficient. So when it's just the victim's word, you can hear about other acts when you are judging whether or not, is this an aberration or is this how he behaves in this context? And I submit to you this is how he behaves.

"As I said, we have more. So again, just to like break it out for you, it's -- the uncharged sexual acts that I'm referring to are the nonconsensual sexual activity of oral copulation and sodomy in Arizona, in Surprise. Remember, she would say he would demand oral sex. I felt that I had to perform that, otherwise I would get a beating.

"She also described nonconsensual activity, sexual activity prior to our charge date in Sacramento, again of oral copulation and rape. Okay. If you believe her testimony regarding these prior incidents by a preponderance of the evidence, you may find that he is predisposed or likely to -- as I said, predisposed or inclined to commit the crimes

8

charged, and that he likely did commit -- that he is likely to commit and did commit the crimes that are charged in this case." The People's arguments concerning prior acts of domestic violence tracked the arguments we have recounted concerning prior acts of sexual violence and highlighted that defendant's testimony on the stand admitting domestic violence. Defendant did not object to the People's characterization of the inference associated with defendant's prior bad acts.

In summing up, the district attorney asked the jury to see that defendant's conduct was consistent with someone who knew what they were doing and that he, in fact, intended to and knowingly committed the crimes charged. Finally, the district attorney stated that beyond a reasonable doubt is not beyond all possible doubt, and that in light of the facts and the law, the jury had no choice but to find defendant was guilty of all crimes charged.

In closing argument, the defendant's counsel for the most part argued that the evidence did not prove that defendant acted with specific intent required by the law and that the victim of these offenses was not credible. He did not take issue with the prosecutor's argument regarding inferences that might arise from evidence of prior uncharged acts of sexual violence or acts of domestic violence.

Finally, in rebuttal, the People did not again refer to inferences that could arise from evidence of defendant's prior bad acts.

Following closing argument, the trial court properly instructed the jury in pertinent part that: "The People presented evidence that the defendant committed certain sex acts that are not charged in this case, specifically: One, in the second house in Surprise, Arizona, defendant committed oral copulation and sodomy against [S.D.]. Two, in Sacramento, California, prior to the conduct alleged in this case, defendant committed oral copulation and rape against [S.D.] The above referenced acts of oral copulation, sodomy, and rape are not charged in this case. The elements of those acts are defined for you in these instructions. You may consider this evidence only if, one, the People have

9

proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.  [¶]  And two, you all agree that the People have proved that the defendant committed at least one of these acts and you agree on which act he committed for each of the following charges:  Count One, rape, and Count Two, sodomy.

"If you decide that the defendant committed the uncharged sex acts, you may, but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit rape and/or sodomy as charged here.

"If you conclude that the defendant committed the sex acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of rape and/or sodomy.  The People must still prove the charge beyond a reasonable doubt.  Do not consider this evidence for any other purpose."

The court also provided similar instructions concerning the defendant's alleged prior acts of domestic violence, and again reminded the jury that "The People must still prove each charge and allegation beyond a reasonable doubt."

As the California Supreme Court has explained, " '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation].'  [Citation.]  Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.  [Citation.]  Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the

10

court or the jury. [Citation.] To establish misconduct, defendant need not show that the prosecutor acted in bad faith. [Citation.] However, [he] does need to 'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." [Citation.]' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.]" (*Centeno, supra*, 60 Cal.4th at p. 666.)

Here, we must decide whether "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Centeno, supra*, 60 Cal.4th at p. 667.)

Rather, " '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] '[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the "statements of advocates." Thus, argument should "not be judged as having the same force as an instruction from the court." ' " (*Cortez, supra*, 63 Cal.4th at pp. 131-132.)

Here, the People's argument did not misstate the law, and in fact tracked the court's later instructions regarding inferences that might arise from evidence of uncharged acts of sexual or domestic violence. While the prosecutor's argument stopped

11

short of relaying the court's entire instruction and therefore omitted that this evidence was only one piece of circumstantial evidence and that the People still had to prove every element of every offense beyond a responsible doubt, her failure to do so was not misconduct. Critically, the court's jury instructions coming after the arguments of counsel accurately conveyed the law relating to circumstantial evidence, proof beyond a reasonable doubt and inferences that may be drawn from evidence of uncharged sexual and domestic misconduct. The court also instructed the jury that its instructions must prevail over any contrary statements of counsel and that the jury had to follow the court's instructions. We presume the jury followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Under these circumstances, it is not reasonably likely the People's argument confused the jury regarding the permissible inferences from defendant's prior conduct and caused that jury to misapply the reasonable doubt standard. (*Cortez, supra,* 63 Cal.4th at p. 130.) Accordingly, this claim fails.

II

*Failure to Identify a Term for Count Five Prior to the Section 654 Stay*

It is well settled that when a court determines that a conviction is subject to section 654, it must *impose* a sentence and then stay the *execution* of that sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. (*People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197-1198; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469; *People v. Salazar* (1987) 194 Cal.App.3d 634, 640.) "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*Salazar,* at p. 640.) It is improper to simply stay the imposition of sentence. (*Duff,* at pp. 795-796; *Alford,* at p. 1468.) The court here imposed an unauthorized sentence by failing to impose a sentence on count

12

five prior to its staying execution of that sentence.  (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1327.)  Because the appropriate term to be imposed involves a discretionary choice (§ 422, subd. (a)), we will remand the matter to allow the trial court to exercise that discretion.

DISPOSITION

The matter is remanded for the limited purpose of allowing the trial court to select and impose a term of imprisonment for count five, and then stay execution of that term pursuant to section 654.  The judgment is otherwise affirmed.

                                          _____

                                          HULL, Acting P. J.

We concur:

_____

MURRAY, J.

_____

HOCH, J.